UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JEFFREY D. SUMMERS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 23-cv-12849-ADB |
| CITY OF FITCHBURG, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| | * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Jeffrey Summers ("Summers"), appearing here pro se, is the President and Director of Jeffrey's House Inc. ("Jeffrey's House"). [ECF No. 1 ("Complaint" or "Compl.") ¶ 1]. He alleges that defendant City of Fitchburg ("Fitchburg") violated his rights and the law when it placed limitations on Jeffrey's House's sober living homes. See generally [Compl.]. Now pending before the Court are Fitchburg's motion to dismiss, [ECF No. 8], and Summers' motion for a temporary restraining order ("TRO") and preliminary injunction ("PI"), [ECF No. 13]. For the reasons set forth below, the motion to dismiss, [ECF No. 8], is GRANTED, and the motion for a temporary restraining order and preliminary injunction, [ECF No. 13], is DENIED as moot.

**I.   Background**

The following relevant facts are taken from the Complaint, which the Court assumes to be true when considering a motion to dismiss. Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014).

Summers is the President and Director of Jeffrey's House, which owns and operates three sober living homes in Fitchburg, including one at 69 High Street, and another at 33 Garnet Street. [Compl. ¶¶ 1, 3]. For ten of the past eleven years, Summers and Jeffrey's House "have continuously been in court with the City of Fitchburg" regarding various zoning and code violations. [Id. ¶ 4].

The allegations in this case stem largely from Fitchburg's treatment of Summers and Jeffrey's House with respect to the properties at 69 High Street and 33 Garnet Street. See, e.g., [Compl. ¶ 5].

A.   69 High Street

69 High Street is a three-story residential group home with eleven bedrooms, five bathrooms, two living rooms, one dining room, and one kitchen. [Compl. ¶ 5]. From 1955 to 2020, 69 High Street was used and licensed as a nursing home, convalescent home, and veterans' hospice. [Id. ¶ 8]. Since 1973, certificates of inspection issued by Fitchburg have included occupancy allowances from twelve to eighteen occupants, and were always for the first two floors only. [Id. ¶ 9]. The third floor could only be used for office space and not residential sleeping quarters because building codes applicable to hospitals, nursing homes, and convalescent facilities with incapacitated residents prohibited occupancy on the third floor for safety reasons. [Id. ¶ 10].

On April 1, 2020, Fitchburg Building Commissioner Mark Barbadoro ("Barbadoro") "issued Veterans Homestead, the former owner/operator of 69 High Street, . . . a CERTIFICATE OF INSPECTION for 14 Occupants," and the "signed Certificate of Inspection indicate[d] that all areas inside and outside of the house ha[d] been inspected and [were] in good working condition." [Compl. ¶ 11].

Summers purchased 69 High Street three months later, on July 1, 2020.  [Compl. ¶ 12]. The property was "of great interest to [him] because it was already ADA [(Americans with Disabilities Act)] accessible with a wheelchair ramp, sprinkler system, a fire alarm system, smoke detectors, handicapped accessible bathrooms, an inside chair lift, 11 bedrooms, and much more."  [Id.].  One month later, he moved twenty-two residents into the building—seven on the first floor, seven on the second floor, and eight on the third floor.  [Id. ¶ 13].

On August 27, 2021, more than a year later, Barbadoro inspected 69 High Street and issued a violation notice for having sleeping units on the third floor.  [Compl. ¶ 20].  He ordered Summers to "immediately vacate the 3rd floor, and to start eviction proceedings on the 8 residents that ha[d] occupied the 3rd floor for over a year."  [Id.].

Summers alleges that Jeffrey's House "is not a nursing home, convalescent home, or medical facility, and [that because] none of the residents are incapacitated or incapable of exiting the property on their own in the case of" an emergency, he "saw no reason to not occupy the 3rd floor like the previous owners."  [Compl. ¶ 21].  Moreover, he states that the third floor has necessary safety items, including sprinklers and fire alarms.  [Id.].

"On August 27, 2021[,] . . . Summers wrote a letter" to Barbadoro "on behalf of Jeffrey's House . . . requesting a REASONABLE ACCOMODATION for the 8 disabled residents" who were living on the third floor.  [Compl. ¶ 22].  Despite knowing that the occupants of Jeffrey's House were disabled, [id. ¶ 30], Barbadoro denied the request on August 30, 2021, stating that

> the reasonable accommodations previously granted to you were granted by then Building Commissioner Robert Lanciani on May 5, 2014.  Since that time the United States Justice Department and the United States Department of Housing and Urban Development has issued new guidance regarding who should grant reasonable accommodations and on what criteria should be used when approving or denying them.

> The guidance came in a joint statement dated November 10, 2016. A copy of the Joint Statement is provided for your consumption.[1] The joint statement gave the following advice on who should grant reasonable accommodations:
>
> Where a local land use or zoning code contains specific procedures for seeking a departure from the general rule, courts have decided that these procedures should ordinarily be followed.
>
> The Fitchburg Zoning Code contains specific procedures for departing from the zoning rules. These procedures are an application for a special permit and an application for a variance from the Fitchburg Zoning Board of Appeals.
>
> I cannot Grant your request because I am not the Special permit granting authority or the variance granting authority. I therefore recommend that you apply for relief in the form of a variance and or a special permit from the Fitchburg Zoning Board of Appeals.

[Id. ¶ 26 (internal quotation marks omitted)].

Jeffrey's House apparently then filed a discrimination claim with the Department of Housing and Urban Development ("HUD"). See [Compl. ¶ 28]. On September 22, 2021, HUD told Jeffrey's House that the denial of its reasonable accommodation request could be investigated. [Id.]. After a six-month investigation during which HUD "never received any response from . . . Fitchburg regarding the inquiry," it "found probable cause to refer the investigation over to the DOJ." [Id. ¶ 29]. The DOJ, however, "decided not to take on the case, and they recommended that Jeffrey's House and Jeffrey Summers litigate their case with a private attorney." [Id.].

---

[1] Summers alleges that the statement provides the following:

> Imposing restrictions or additional conditions on group homes for persons with disabilities that are not imposed on families or other groups of unrelated individuals, by, for example, requiring an occupancy permit for persons with disabilities to live in a single-family home while not requiring a permit for other residents of single-family homes is a violation of the Fair Housing Act.

[Compl. ¶ 37 (emphasis omitted)].

4

As a result of "being threatened, intimidated, taken to court, and fined," Summers ultimately gave the eight third floor occupants of 69 High Street eviction notices, and the third floor was vacant from April 2022 through April 2023, costing Jeffrey's House $57,600.  [Compl. ¶ 31].  In addition, Summers had spent $6,000 for a "complete architectural analysis of 69 High Street," which determined that "69 High Street could safely house 40 residents, including full use of the third floor."  [Id.].[2]

On July 12, 2022, Summers and Jeffrey's House were "on the agenda at the Fitchburg Zoning Board of Appeals [("ZBA")] Meeting regarding their REASONABLE ACCOMODATION request to increase the occupancy of 69 High Street to 22 residents, as well as to be allowed to use the 3rd floor."  [Compl. ¶ 32].  The ZBA instead voted to "1. Decrease the occupancy[,] 2. Not allow the 3rd floor to be used for sleeping purposes[,] 3. Require[] that every resident has to have their own room (Single room occupancy)[, and] 4. Require[] that the kitchen had to be a COMMERICAL KITCHEN."  [Id.].  The Fitchburg City Clerk certified the ruling seven months later, on February 7, 2023, even though Summers alleges that "M.G.L. Chapter 40A, Title VII Section 9 states: 'Failure by the special permit granting authority to take final action within said ninety days or extended time, if applicable, shall be deemed to be a grant of the special permit.'"  [Id. ¶ 33].[3]

---

[2] Plaintiff also alleges that despite 33 Garnet Street having less square footage than 69 High Street, it was "inexplicably" allowed to have more residents.  [Compl. ¶ 7].

[3] Mass. Gen. Laws Ch. 40A § 9 states, in part, the following:

> Each application for a special permit shall be filed by the petitioner with the city or town clerk and a copy of said application, including the date and time of filing certified by the city or town clerk, shall be filed forthwith by the petitioner with the special permit granting authority.  The special permit granting authority shall hold a public hearing, for which notice has been given as provided in section eleven, on any application for a special permit within sixty-five days from the date of filing of

Summers alleges that the ZBA's denial was "arbitrary, capricious, illegal, and racist." [Compl. ¶ 34]. Specifically, he alleges it was "arbitrary and capricious because 69 High Street has had double and sometimes triple room occupancy since 1955." [Id.]. It was illegal, he avers, because "the State Sanitary Code is the law that determines the number occupants in a room, not the ZBA." [Id.]. And he states that it

> was racist because 69 High Street was owned and operated by White Proprietors for the last 75 years, and it was always permitted to have double and sometimes triple occupancy, and the property always had a standard kitchen not a commercial kitchen. There is no legitimate reason with the exception of racism for the Fitchburg ZBA to rule that the first and only Black Man to ever own 69 High Street is required to only have single room occupancy and a commercial kitchen.

[Id.].

Moreover, Summers states that Fitchburg City Hall records indicate that in 113 years, no one except Summers and Jeffrey's House have been required to obtain a certificate of occupancy

---

> such application; provided, however, that a city council having more than five members designated to act upon such application may appoint a committee of such council to hold the public hearing. The decision of the special permit granting authority shall be made within ninety days following the date of such public hearing. The required time limits for a public hearing and said action, may be extended by written agreement between the petitioner and the special permit granting authority. A copy of such agreement shall be filed in the office of the city or town clerk. A special permit issued by a special permit granting authority shall require a two-thirds vote of boards with more than five members, a vote of at least four members of a five member board, and a unanimous vote of a three member board.
>
> . . .
>
> Failure by the special permit granting authority to take final action within said ninety days or extended time, if applicable, shall be deemed to be a grant of the special permit.

Id.

or a special permit, and that "Fitchburg has weaponized obtaining these two documents against them." [Compl. ¶ 35]. In fact, even though Summers applied for a certificate of occupancy for a year before filing the Complaint, the "requirements keep changing and every time Mr. Summers thinks he is close to obtaining" a certificate, Fitchburg "comes up with a different reason to deny granting it." [Id. ¶ 36].

On July 12, 2022, Summers was granted a special permit to operate a sober living home at 69 High Street. [Compl. ¶ 38]. He did not agree with the terms of the permit, though, so he appealed the ZBA's decision to the state superior court. [Id.]. Despite that appeal, the Fitchburg ZBA voted to fine Summers $300 per week until he recorded the ZBA's decision at the registry of deeds, but Summers has not done so because he does not "see the logic in recording a decision that he is appealing and that he vehemently disagrees with." [Id.].

More than a year later, on November 14, 2023, the ZBA said Summers owes Fitchburg nearly $50,000, which Summers "believes" is the "result of Fitchburg's discrimination and racism, as well as Worcester Housing Court's bias and favoritism." [Compl. ¶ 39]. As evidence of the bias and favoritism, Summers states that John Goggins, the Clerk of the Worcester Housing Court who oversaw proceedings and litigation in which Donna Pawlak ("Pawlak"), Fitchburg's Assistant City Solicitor, [id. ¶ 18], "brought Jeffrey's House and Jeffrey Summers to court," [id. ¶ 40]. He alleges they were "former law partners" and did not reveal that relationship. [Id.].

### B. 33 Garnet Street

33 Garnet Street is another sober living home owned and operated by Jeffrey's House. [Compl. ¶ 1]. On August 18, 2021, 33 Garnet Street was ordered to shut down by a Worcester Housing Court judge because Summers had failed to install sprinklers. [Id. ¶ 14]. Apparently as

7

a result of this decision, Summers was held in contempt of court, sent to prison, and the house was ordered vacated. [Id.]. The Judge ordered Summers to place the residents in a hotel at his own expense. [Id.]. Summers was "distraught" as a result of these events. [Id. ¶ 17].

Thereafter, the Fitchburg City Solicitor, Vincent Pusateri ("Pusateri") sent an email to Summers' attorney suggesting that individuals could be placed at a different home called Crossing Over, run by Felix Colon ("Colon"), despite Pusateri knowing that Crossing Over also did not have sprinklers. [Compl. ¶¶ 15–17]. Plainitff alleges that Pusateri nonetheless recommended Crossing Over because he has a "personal relationship" with Colon. [Id. ¶ 17].

Ten months later, on June 13, 2022, Summers received a certificate of completion for the installation of sprinklers at 33 Garnet Street. [Compl. ¶ 18]. Pawlak, however, "willfully, intentionally, maliciously, and illegally fought to keep 33 Garnet Street closed for an additional 11 months after the sprinklers were installed." [Id.]. The house was ultimately ordered reopened in May 2023, but the eleven-month delay cost Jeffrey's House and Summers $99,000 in rental revenue. [Id. ¶ 19].

C.   **Procedural History**

Summers filed his Complaint on November 22, 2023, bringing the following eight claims: conspiracy to violate civil rights (Count I), violation of the Americans with Disabilities Act ("ADA") and Fair Housing Act ("FHA") (Count II), intentional infliction of emotional distress (Count III), selective enforcement in violation of the equal protection clause (Count IV), interference with advantageous business relations (Count V), deprivation of rights under color of law (Count VI), violations of Section 504 of the Rehabilitation Act of 1973 (Count VII), and violations of Section 109 of the Housing and Community Development Act of 1974 (Count VIII). [Compl. ¶¶ 42–72]. Fitchburg moved to dismiss the Complaint on December 21, 2023,

[ECF No. 8], and Summers opposed on January 24, 2024, [ECF No. 12].  Then, on February 5, 2024, Summers moved for a TRO and PI.  [ECF No. 13].

## II.     Standard Of Review

Under Federal Rule of Civil Procedure 12(b)(6), a complaint "must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Cardigan Mt. Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)).  This pleading standard requires "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Id. (quoting Twombly, 550 U.S. at 570).

When evaluating the sufficiency of a complaint, the Court "first must 'distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  Cardigan Mt. Sch., 787 F.3d at 84 (quoting García–Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013)) (further internal quotations and citation omitted).  "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged."  García–Catalán, 734 F.3d at 103 (internal quotations and citation omitted).  In conducting this analysis, the Court must accept all well-pleaded facts as true and analyze those facts in the light most favorable to the plaintiff's theory, drawing all reasonable inferences in favor of the plaintiff.  U.S. ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011).

Moreover, the Court construes the complaint liberally because it was filed pro se. See Erickson v. Pardus, 551 U.S. 89, 94 (2007). "However, pro se status does not insulate a party from complying with procedural and substantive law." Ahmed v. Rosenblatt, 118 F.3d 886, 890 (1st Cir. 1997). Dismissal of a pro se complaint is "appropriate when the complaint fails to suggest an actionable claim." Muller v. Bedford VA Admin. Hosp., 2013 WL 702766, at *3 (D. Mass. Feb. 25, 2013) (citing Overton v. Torruella, 183 F. Supp. 2d 295, 303 (D. Mass. 2001)).

## III.    Discussion

As an initial matter, Fitchburg argues that Summers cannot represent Jeffrey's House pro se in this matter, and that "[t]he alleged tortious actions committed by Fitchburg for denying applications and denying accommodations were taken against the owner of the property, Jeffrey's House[]. Despite Summers naming himself as a plaintiff, the claims in this case are all brought on behalf of Jeffrey's House[] against Fitchburg." [ECF No. 9 at 5]. In response, Summers states that he "is not attempting to represent Jeffrey's House, but has to discuss Jeffrey's House[] in order to discuss the allegations in this matter." [ECF No. 12 ¶ 19].[4]

"Although an individual has a statutory right to represent himself in federal court even if he is not a lawyer, 28 U.S.C. [§] 1654, a corporation may be represented only by licensed counsel." In re Victor Publishers, Inc., 545 F.2d 285, 286 (1st Cir. 1976). In addition, Local Rule 83.5.5(c) states that

> a corporation, partnership, limited liability company, trust, estate, or other entity that is not an individual may not appear pro se. An individual officer, director, partner, member, trustee, administrator, or executor may not appear on behalf of an entity; provided, however, that if such an individual is also an attorney who is otherwise permitted to practice in this court, the attorney may represent the entity

---

[4] Despite this argument, Summers repeatedly refers to "Plaintiffs" in his complaint. See, e.g., [Compl. ¶ 52]. The Court does not correct that here, but notes both the inconsistency and the fact that this tends to support a finding that at least some of the claims here should be brought by Jeffrey's House, not Summers.

> if the representation is otherwise appropriate under the circumstances. The court
> may strike any pleading filed on behalf of any entity that purports to appear pro se.

Id. (emphasis omitted).

Accordingly, and in light of Summers' response, Jeffrey's House is not a plaintiff in this suit, and the Court will construe and evaluate all claims here as brought by Summers on his own behalf.

### A.   Count I: Conspiracy to Violate Civil Rights

Summers alleges that as a result of being "intimidated, threatened, harassed, and coerced to accept the city's discriminatory practices or be fined, jailed, and evicted," he has "suffered lasting emotional, physical, and financial harm, and a continuing deprivation and devaluation of his property and dignity interest as a result." [Compl. ¶¶ 43–44].

The Complaint does not identify any particular right or a law through which the Court should analyze Count I. See [Compl. ¶¶ 42–44]. Fitchburg points to the Massachusetts Civil Rights Act ("MCRA"), [ECF No. 9 at 7], Mass Gen. Laws Ch. 12, § 11I, which provides that

> Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief as provided for in said section, including the award of compensatory money damages. Any aggrieved person or persons who prevail in an action authorized by this section shall be entitled to an award of the costs of the litigation and reasonable attorneys' fees in an amount to be fixed by the court.

Id. Fitchburg then argues, and the Court agrees, that "a municipality cannot be sued under the MCRA." [ECF No. 9 at 7 (quoting Kelley v. LaForce, 288 F.3d 1, 11 n.9 (1st Cir. 2002) (citing

11

Howcroft v. City of Peabody, 747 N.E.2d 729, 744 (Mass. App. Ct. 2001) (concluding that a municipality is not a "person" within the terms of the MCRA)))].[5]

Summers, in his response, states that he "has set forth [a] cause[] of action . . . under 42 U.S.C. § 1985 for Conspiracy to Violate Civil Rights," [ECF No. 12 ¶ 9], but does not provide any specific argument explaining how he has done so.  In order to state a claim under 42 U.S.C. § 1985, one must have a viable claim under 42 U.S.C. § 1983, Gattineri v. Town of Lynnfield, 58 F.4th 512, 516 (1st Cir. 2023), which as explained below, Summers does not, see infra.[6]

Accordingly, Count I is dismissed.

### B.  Counts II and VII: ADA, FHA, and Section 504 Violation

Summers alleges that Fitchburg violated the ADA and FHA when it "denied Jeffrey's House's written request for disability-related Reasonable Accommodation." [Compl. ¶ 46]. Similarly, he avers that Fitchburg violated Section 504 of the Rehabilitation Act of 1973 when it "den[ied] the disabled residents of Jeffrey's House of their right to Fair Housing." [Id. ¶¶ 68–70].

These claims, even liberally construed, are brought on behalf of Jeffrey's House and/or Jeffrey's House on behalf of its residents, not Summers.  Accordingly, because Jeffrey's House

---

[5] Similar to Summers' reference to multiple "Plaintiffs," see supra, he repeatedly refers to "Defendants," plural.  See, e.g., [Compl. ¶¶ 50, 57, 59].  The Court notes that the City of Fitchburg is the only defendant named in this case.

[6] In any event, the Complaint does not plausibly allege, as required for a § 1985 claim, an agreement between two or more individuals, including the defendant, to deprive Summers of his civil rights.  Alston v. Spiegel, 988 F.3d 564, 577–78 (1st Cir. 2021).  For example, setting aside whether any of these individuals' actions could be imputed to Fitchburg, Summers does not allege that Pusateri and Colon agreed to shut down 33 Garnet Street so that Colon would get additional business.  See [Compl. ¶¶ 14–17].  Instead, he merely alleges that Pusateri and Colon knew one another.  [Id. ¶ 17].  As another example, he does not allege that Pawlak or Goggins made any agreement to violate his rights—only that he should have been informed of their relationship and Goggins should have recused himself.  [Id. ¶ 40].

12

is not a plaintiff in this case and, even if it were, Summers cannot represent Jeffrey's House pro se, see supra, Counts II and VII are dismissed.

### C. Counts III and V: Intentional Infliction of Emotional Distress and Interference with Advantageous Business Relations

Summers alleges that Pusateri's decision to force Jeffrey's House residents to leave 33 Garnet Street, and Pawlak's decision to delay the re-opening of 33 Garnet Street, constituted intentional infliction of emotional distress. [Compl. ¶¶ 50–52]. In addition, he states that Fitchburg has "damaged present and potential business relationships between Plaintiffs and his residents," [id. ¶ 57], by (1) telling another organization "that if they conducted business with Jeffrey's House the City would not conduct business with them," [id. ¶ 58]; (2) causing "many residents to move out in fear that the house [will] be shut down and they would be homeless," [id. ¶ 59]; and (3) keeping 33 Garnet Street "closed for no legitimate reason," [id. ¶ 60]. As a result, his "ability to earn a living has been damaged and he has endured financial losses." [Id. ¶ 61].

Defendant argues that these claims must be dismissed because Fitchburg, a town and public employer, cannot be held liable for intentional torts. [ECF No. 9 at 9–10]. Summers does not respond to this argument. See generally [ECF No. 12].

As an initial matter, the aggrieved party in these claims appears to be Jeffrey's House, not Summers. In any event, even assuming Summers were the aggrieved party, the claims fail because Fitchburg, a municipality, cannot be liable for intentional torts. See LaForce, 288 F.3d at 12–13 ("a municipality enjoys governmental immunity for intentional torts under the Massachusetts Tort Claims Act." (citing Mass. Gen. Laws ch. 258, § 10(c) (governmental immunity is retained for "any claim arising out of an intentional tort, including assault, battery,

13

false imprisonment, ... misrepresentation, deceit, ... interference with advantageous relations or interference with contractual relations")).  Accordingly, Counts III and V are dismissed.

> **D.    Counts IV and VI: Selective Enforcement in Violation of Equal Protection Clause and Deprivation of Rights Under the Color of Law**

With respect to Count IV, selective enforcement in violation of the equal protection clause, Summers alleges that "Defendants intentionally, willfully, recklessly, and repeatedly harassed, abused, and humiliated Plaintiffs although they knew they committed no crimes and failed to sanction or prosecute other houses of similar size or of similar community living situations."  [Compl. ¶ 54].  Further, he avers that "Defendants' repeated selective enforcement of the law for the benefit of similarly situated property owners (namely the exact same property located at 69 High Street when it was previously owned by a White Proprietor) and against the Plaintiffs violated" his "rights to equal protection of the laws and the privileges and immunities of citizenship" under the Fifth and Fourteenth Amendments.  [Id. ¶ 55].

With respect to Count VI, deprivation of rights under the color of law, Summers alleges that Barbadoro allowed 69 High Street to pass inspection for a white owner, but not him (a black owner), and that the ZBA's decisions were made "strictly because of racism."  [Compl. ¶¶ 64–65].

Fitchburg argues that these claims must be dismissed because "plaintiff has not identified any discernible custom or policy underlying the municipal conduct," and thus there is no municipal liability under Monell v. Department of Social Services of N.Y., 436 U.S. 658 (1978). [ECF No. 9 at 10–12; see also [id. at 12 (arguing that Summers has not identified any particular right violated for purposes of Count VI, but that in any event, such a claim would "presumably" be brought under Section 1983 and would fail under Monell)].  Plaintiff responds that the "Complaint sets forth (albeit not using the magic words 'Monell') a custom or policy that has

14

prevented him from being able to successfully operate his business affairs without inference and hindrances from the Defendant." [ECF No. 12 ¶ 25].

Under Monell, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." 436 U.S. at 691 (emphasis omitted). However, "a municipality . . . may be held liable when" a plaintiff's injury is directly caused by either: (1) a municipal policy or (2) a municipal custom. Thomas v. Town of Chelmsford, 267 F. Supp. 3d 279, 305 (D. Mass. 2017) (citing Monell, 436 U.S. at 694).

Beginning with municipal policy: "[a] Section 1983 claim based on a theory of municipal policy is only viable where 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" Freeman v. Town of Hudson, 849 F. Supp. 2d 138, 149 (D. Mass. 2012) (quoting Monell, 436 U.S. at 690), aff'd, 714 F.3d 29, 38 (1st Cir. 2013). "[A] single decision by [a] person with final policy-making authority may result in municipal liability under certain circumstances. . . . However, this single action 'must be taken by a municipal official with final policy-making authority in the relevant area of the city's business.'" Id. (citing Welch v. Ciampa, 542 F.3d 927, 942 (1st Cir. 2008); and then quoting Roma Constr. Co. v. aRusso, 96 F.3d 566, 576 (1st Cir. 1996)). The action constituting a municipal policy also "must be . . . the moving force behind the constitutional violation." Bordanaro v. McLeod, 871 F.2d 1151, 1162 (1st Cir. 1989).

Turning to municipal custom: to establish a § 1983 claim based on a municipal custom, the custom "must be attributable to the municipality," Whitfield v. Melendez-Rivera, 431 F.3d 1, 13 (1st Cir. 2005), such that it is "so well settled and widespread that the policymaking officials

of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," Baez v. Town of Brookline, 44 F.4th 79, 82 (1st Cir. 2022) (quoting Whitfield, 431 F.3d at 13).  Evidence of a single incident of a constitutional deprivation "is insufficient, in and of itself, to establish a municipal 'custom or usage' within the meaning of Monell."  Mahan v. Plymouth Cnty. House of Corrs., 64 F.3d 14, 16–17 (1st Cir. 1995) (emphasis omitted).  Allegations of "multiple instances of misconduct" that suggest a "systemic pattern of activity," however, may support an inference of a municipal custom.  Doe v. Town of Wayland, 179 F. Supp. 3d 155, 173 (D. Mass 2016) (citing Baron v. Suffolk Cnty. Sheriff's Dep't, 402 F.3d 225, 239 (1st Cir. 2005) (abrogated on other grounds)).  As with a municipal policy, "the custom must have been the cause of and 'the moving force behind' the constitutional violation."  Id. at 172 (quoting Bordanaro, 871 F.2d at 1156).

Here, there are no allegations to support a finding that any of the individuals who took action against Summers had policy-making authority for the City of Fitchburg.  See Freeman, 849 F. Supp. 2d at 149.  Moreover, the allegations here are insufficient to support a finding that Fitchburg had any policy or custom that was being unlawfully applied here.  Accordingly, Count IV is dismissed.

### E. Count VIII: Section 109 of the Housing and Community Development Act of 1974

Summers' final claim is that he is entitled to relief for discrimination under the Housing and Community Development Act ("HCDA") because Fitchburg, a recipient of funds under HCDA, discriminated against him.  [Compl. ¶¶ 71–72].

Fitchburg argues that the HCDA does not create a private cause of action, and thus this count must be dismissed.  [ECF No. 9 at 12–14].  The Court agrees.  In Latinos Unidos de Chelsea en Accion (Lucha) v. Secretary of Housing and Urban Development, the First Circuit

16

held that "Section 109(a) of [HCDA], 42 U.S.C. § 5309(a)" did not create a private cause of action because "Title I was [not] enacted for their 'especial benefit' in the sense required for finding a private right of action." 799 F.2d 774, 793–94 (1st Cir. 1986). Accordingly, Count VIII is dismissed.[7]

## IV. CONCLUSION

Accordingly, Fitchburg's motion to dismiss, [ECF No. 8] is <u>GRANTED</u>. All counts are dismissed without prejudice. In addition, Summers' motion for a temporary restraining order and preliminary injunction, [ECF No. 13], is <u>DENIED</u> as moot. The Court sympathizes with Summers and his evident frustration, but there is no available federal remedy based on the claims as currently presented. To the extent that he intends to continue pursuing claims in federal court, the Court strongly recommends that he retain counsel, at least to represent the business entity.

**SO ORDERED.**

February 12, 2024                                             /s/ Allison D. Burroughs
                                                              ALLISON D. BURROUGHS
                                                              U.S. DISTRICT JUDGE

---

[7] Because the Court dismisses all counts, it need not address the motion for a TRO and PI. [ECF No. 13]. That said, for completeness, the Court notes that because all counts are dismissed, Summers is unlikely to succeed on his claims, which would be fatal to his request for a TRO and PI. See <u>Ryan v. U.S. Immigr. & Customs Enf't</u>, 974 F.3d 9, 18 (1st Cir. 2020) (citations omitted) ("The movant's likelihood of success on the merits weighs most heavily in the preliminary injunction calculus," and the First Circuit has described that factor "as the 'sine qua non' of preliminary injunctive relief."); <u>New Comm Wireless Servs., Inc. v. SprintCom, Inc.</u>, 287 F.3d 1, 9 (1st Cir. 2002) ("if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity."); <u>Kilmowicz v. Deutsche Bank Nat'l Tr. Co.</u>, 192 F. Supp. 3d 251, 253 (D. Mass. 2016) (same with respect to a TRO).